Benjamin Galdston (Bar No. 211114)
BERGER MONTAGUE PC
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Tel: (619) 489-0300
bgaldston@bm.net

(additional counsel on signature page)

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINCOLN NETWORK, INC., Individually and on behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>     vs.<br><br>PNC FINANCIAL SERVICES GROUP, INC. and PNC BANK, NATIONAL ASSOCIATION,<br><br>     Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**(1) UNFAIR BUSINESS PRACTICES IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200,** *et seq.***;**<br>**(2) FALSE ADVERTISING IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17500,** *et seq.***;**<br>**(3) BREACH OF FIDUCIARY DUTY; and**<br>**(4) NEGLIGENCE**<br><br>DEMAND FOR JURY TRIAL |

# **TABLE OF CONTENTS**

Page(s)

I.     INTRODUCTION .................................................................. 2

II.    THE PARTIES ..................................................................... 6

       A.     Plaintiff ................................................................... 6

       B.     Defendants .............................................................. 7

III.   JURISDICTION AND VENUE ........................................... 8

IV.    FACTUAL ALLEGATIONS ............................................... 8

V.     CLASS ACTION ALLEGATIONS ..................................... 14

FIRST CAUSE OF ACTION
     Violation of California Business & Professions Code § 17200, et seq. .......... 16

SECOND CAUSE OF ACTION
     Violation of California's False Advertising Law, California Business &
     Professions Code § 17500, et seq. ................................................. 18

THIRD CAUSE OF ACTION
     Breach of Fiduciary Duty ............................................................ 18

FOURTH CAUSE OF ACTION
     Negligence ................................................................................. 19

VI.    DEMAND FOR JURY TRIAL ........................................... 20

VII.   PRAYER FOR RELIEF ....................................................... 20

Plaintiff Lincoln Network, Inc. ("Lincoln Network" or "Plaintiff") brings this class action complaint on behalf of itself and those similarly situated (collectively, "Plaintiffs") against Defendants PNC Financial Services Group, Inc. ("PNC FSG") and PNC Bank, National Association ("PNC Bank") (collectively, "PNC" or "Defendants"). Plaintiff alleges the following based upon its information and belief and the investigation of its counsel and personal knowledge as to the allegations pertaining to it.

# I.    INTRODUCTION

1.    Defendant PNC Bank has exploited the Coronavirus crisis to line its pockets with hundreds of millions of taxpayer dollars while compounding the economic hardship suffered by small businesses and independent contractors—"hardworking Americans and businesses that, through no fault of their own, have been adversely impacted by the coronavirus outbreak," according to U.S. Treasury Secretary Steven Mnuchin.

2.    The U.S. Small Business Administration ("SBA") Paycheck Protection Program ("PPP") was intended to help "overcome the challenges" of the Coronavirus crisis and "provide a direct incentive to small businesses to keep their workers on the payroll" by providing SBA-guaranteed loans of up to $10 million to qualified applicants.[1] Anticipating the massive demand for relief and to ensure non-preferential distribution of funds, the PPP's governing rules required that banks process applications on a "***first-come, first-served***" basis.[2]

3.    In violation of these rules, California law, and their fiduciary obligations, Defendants favored their own interests by prioritizing larger loan

---

[1] https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program-ppp#section-header-4 (last visited April 22, 2020).

[2] https://www.sba.gov/sites/default/files/2020-04/PPP--IFRN%20FINAL_0.pdf (last visited April 22, 2020).

applications for bigger businesses and PNC's own banking clients ahead of smaller businesses, independent contractors and applicants who were not existing PNC customers. Indeed, news reports have revealed that banks provided preferential "concierge" treatment for their wealthiest clients, including a two-tiered system providing fast-track procedures for the bank's most valuable customers that avoided cumbersome and buggy online portals which ordinary mom and pop businesses were required to use.[3]

4.     For every loan completed, PNC received between 1% and 5% of the loan amount in fees, depending on the amount of the loan. Loans worth less than $350,000 brought in 5% in fees while loans worth between $2 million and $10 million brought in 1% in fees. In total, Defendants and other banks have received approximately **_$10 billion in fees_** to date. PNC alone received more than 75,000 applications nationally for PPP loans totaling $6 billion as of April 15, 2020, according to a recent Pittsburgh Business Times report.[4]

5.     In addition to enormous fees, PNC also benefited from moving bigger and existing customers to the front of the line for PPP loans. For example, PNC's illegal practices enabled it to mitigate its own risk exposure to default by large, existing clients with whom PNC maintained outstanding credit lines or other capital commitments. Additionally, favoring existing customers meant that PNC received the funds deposited into PNC accounts, which improved the bank's liquidity.

6.     Meanwhile, PNC bears no risk whatsoever on the SBA loans made under the PPP, and the expedited processes designed to rapidly provide relief

---

[3] https://www.nytimes.com/2020/04/22/business/sba-loans-ppp-coronavirus.html (last visited April 23, 2020).

[4] https://www.bizjournals.com/pittsburgh/news/2020/04/15/pncs-paycheck-protection-program-loans-add-up.html (last visited April 22, 2020).

meant that PNC and other banks did less work to vet applications than for traditional SBA or other loans.

7.     PNC FSG recently highlighted its participation in the PPP during its quarterly earnings conference call with analysts and investors on April 15, 2020. During the call, CEO William Demchak claimed the bank was "[h]elping thousands of business customers apply for emergency relief loans," "providing relief to customers," and "[c]ontinuing to provide liquidity to corporate clients." Selected slides accompanying Mr. Demchak's discussion of the bank's business are below:



8.     Mr. Demchak, however, did not disclose that Defendants were violating SBA regulations and requirements, California law, and their fiduciary obligations to borrowers and customers by fast-tracking certain PNC customers and large loan applications over ordinary small businesses like Lincoln Network and others.

9.     Plaintiff Lincoln Network's experience applying for a PPP loan through PNC is typical of other Class members. After reading about the program and available funds, Lincoln Network reached out to the PNC on March 27, 2020, asked for guidance to prepare and submit a PPP loan application as soon as possible. PNC advised Lincoln Network to submit an application through its online portal, stating "we're here for you" and "PNC is committed to helping [its] customers and business owners with the Paycheck Protection Program." However, Defendants also admonished that "customers should not go to the Branches [sic] or contact our Customer Care center as they will not be able to assist with the online application process." Non-PNC customers were told they would only be able to apply through PNC's online portal one week later.

10.     Lincoln Network is, and has been since 2017, a PNC small business banking customer. On April 3, 2020, the very first day that lenders were permitted to accept applications, Lincoln Network submitted all required documentation to PNC seeking a loan of $253,516.48. Accordingly, the Lincoln Network's loan amount was within the bottom tier of potential fees that PNC could earn by processing the application. However, based on the "first-come, first-served" rule, Lincoln Network's application should have been promptly submitted to the SBA. Instead, PNC apparently delayed submitting its application. On April 17, 2020, PNC informed Lincoln Network via email that its application had not been timely submitted. Instead, a bank representative told Lincoln Network that PNC was "getting all the apps [applications] that didn't make it in ready so as soon as [sic]

government puts more money in we can submit." On April 18, 2020, PNC claimed without explanation that it was "unable to complete the review and SBA registration process" for Lincoln Network's PPP loan application "before the SBA announced on its website that it is unable to accept new applications for the PPP program because the authorized funding has been fully allocated."

11.    At no time did PNC disclose and Plaintiff was unaware that PNC was violating the PPP governing rules by favoring existing PNC customers and applicants seeking larger loans and putting smaller borrowers like Lincoln Network to the back of the queue or not submitting their application at all.

12.    As of the date of this Complaint, Plaintiff and other members of the proposed Class have suffered enormous and potentially irreversible damages. For example, unlike those favored by PNC and other big banks, Plaintiff and other Class members have not received funds or approval of their loan applications. Additionally, the delay caused by PNC's misrepresentations and omissions caused hardship, including business cessation, for many applicants who were and are desperately seeking a lifeline through the PPP.

13.    Through this litigation, Plaintiff seeks an injunction preventing PNC from continuing its illegal business practices, compensation for the harms caused by misconduct alleged herein, and all other relief that the Court deems appropriate.

## II.    THE PARTIES

### A.    Plaintiff

14.    Plaintiff Lincoln Network, Inc. is a 501(c)(3) tax exempt organization incorporated in Delaware with its primary business address at 2443 Fillmore Street, #380-3386, San Francisco, CA 94115.

15.    Lincoln Network's mission is to build a community of innovators who embrace technology and educate the public about platforms and policies that advance liberty. In particular, Lincoln Network is dedicated to increasing

government efficiency, effectiveness and responsiveness through technology and innovation to better serve the public while increasing individual liberty and economic opportunity for all Americans.

16.    Lincoln Network is, and at all relevant times was, a small business banking customer of Defendants since 2017.

17.    At all times relevant herein, Lincoln Network met all applicable requirements to obtain loan funds under the PPP.

### B.    **Defendants**

18.    Defendant PNC Financial Services Group, Inc. is a national commercial bank, financial services provider, and bank holding company incorporated in the Commonwealth of Pennsylvania with its principal business address at 300 Fifth Avenue, Pittsburgh, PA 15222. According to its most recent annual report on Form 10-K filed with the U.S. Securities and Exchange Commission ("SEC") on March 2, 2020, PNC FSG is "one of the largest diversified financial services companies in the United States," operating businesses across the U.S., including Defendant PNC Bank, National Association, engaged in corporate and institutional banking and asset management, as well as retail banking. As of December 31, 2019, PNC FSG's consolidated total assets, total deposits and total shareholders' equity were $410.3 billion, $288.5 billion and $49.3 billion, respectively. *Id*. PNC FSG's "largest source of liquidity . . . is the customer deposit base generated by our banking business." *Id*. at 66.

19.    Defendant PNC Bank, National Association ("PNC Bank") is a national commercial bank and wholly owned subsidiary of PNC FSG with its principal business address at 300 Fifth Avenue, Pittsburgh, PA 15222.  PNC Bank is one of the largest SBA lenders currently participating in the PPP.

### III.     JURISDICTION AND VENUE

20.     The Court has original jurisdiction over this matter under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which (i) at least some of the members of the proposed Class have different citizenship from the Defendants; (ii) the proposed Class consists of more than 100 persons or entities; and (iii) the claims of the proposed Class members collectively exceed $5 million.

21.     The Court has personal jurisdiction over Defendants because they do business in this District and a substantial number of events giving rise to the claims asserted herein took place in California.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial number of the events giving rise to the claims asserted herein took place in this District.  For example, Plaintiff's principal place of business is located in San Francisco and Defendants marketed, promoted, and received applications for PPP loans within this District. Pursuant to California Civil Code §§ 1770 and1780(d), Plaintiff is filing concurrently with this Complaint an affidavit stating facts showing that this action has been commenced in San Francisco County as a proper place for the trial of the action. *See* Exhibit A.

### IV.     FACTUAL ALLEGATIONS

23.     The Coronavirus Aid, Relief, and Economic Security (CARES) Act, signed into law on March 27, 2020, allocated $349 billion in taxpayer funds to the SBA to make low interest "forgiveable" loans through the PPP to qualifying small businesses, non-profits and independent contractors. Congress enacted the legislation to help keep workers employed and paid amid the Coronavirus pandemic and economic downturn. PPP loans are 100% federally guaranteed; meaning, the banks that originate PPP loans bear no risk unlike loans made using their own funds.

24.     As an approved SBA lender, Defendants are required to "service and liquidate all covered loans made under the Paycheck Protection Program in accordance with PPP Loan Program Requirements," including any SBA rules or guidance, pursuant to the SBA Lender Agreement they signed.[5] In particular, PNC, like all SBA lenders participating in the PPP program, must process applications on a "***first-come, first-served***" basis.

25.     Moreover, all SBA lenders including Defendants "must act ethically" and may not, among other things, (i) self-deal; (ii) have a real or apparent conflict of interest with a borrower; (iii) knowingly misrepresent or make a false statement to the SBA; (iv) engage in conduct reflecting a lack of business integrity or honesty; or (v) engage in any activity which taints the bank's objective judgment in evaluating the loan. *See* 13 CFR Part 120.140. Defendants breached these duties, as well as California law and their fiduciary obligations.

26.     Critically, because each loan will be registered under a Taxpayer Identification Number, small business owners could only apply ***once*** for a loan through the PPP. Borrowers could not submit multiple applications through different banks. In submitting its PPP loan applications to Defendants, Plaintiff was precluded from seeking PPP relief through a different lender that was not engaging in the same improper practices as Defendants.

27.     According to the SBA Office of Advocacy, in 2018, the country had 30.2 million small businesses, representing 99.9% of all U.S. businesses and 47.5% of all employees in the U.S. Of these 30.2 million U.S. small businesses, 22 million are individually operated, with no employees other than the owner.

28.     In 2018, the average loan amount backed by the SBA was $107,000.

---

[5] https://www.sba.gov/sites/default/files/2020-04/PPP--Agreement-for-New-Lenders-Banks-Credit-Unions-FCS-w-seal-fillable.pdf (last visited April 22, 2020).

29.    Beginning on April 3, 2020, small businesses and sole proprietorships could apply for and receive loans through the PPP.  Beginning on April 10, 2020, independent contractors and self-employed individuals could apply for and receive such loans.  The last day to apply for and receive a loan through the PPP is June 30, 2020.

30.    Loans through the PPP were time-sensitive as they were to be administered on a "first-come, first-served" basis.  Consequently, loans should have been considered by banks in the order in which they were received, rendering the loan amount insignificant.

31.    Lenders of PPP loans earned varying percentages of origination fees, based on the loan amount: 5% on loans not more than $350,000; 3% on loans more than $350,000 but less than $2,000,000; and 1% on loans more than $2,000,000.

32.    Because of the tiered percentage-based origination fees, lenders were financially incentivized to approve of larger loans ahead of smaller ones: one percent fees on a $5,000,000 loan would earn a bank $50,000 while five percent on a $350,000 loan would earn $17,500.

33.    The SBA tracked the numbers of approved loans and dollars for both the first 10 days of the PPP (April 3 through April 13, first chart) and through the last 3 days (April 14 through April 16, second chart).

| Loan Size | Approved Loans | Approved Dollars | % of Count | % of Amount |
|---|---|---|---|---|
| $150K and Under | 725,058 | $37,178,984,187 | 70.05% | 15.02% |
| >$150K - $350K | 156,590 | $35,735,615,983 | 15.13% | 14.44% |
| >$350K - $1M | 102,473 | $59,291,602,643 | 9.90% | 23.95% |
| >$1M - $2M | 31,176 | $43,278,883,532 | 3.01% | 17.48% |
| >$2M - $5M | 16,516 | $49,288,997,593 | 1.60% | 19.91% |
| >$5M | 3,273 | $22,769,309,582 | 0.32% | 9.20% |

- Overall average loan size is $239,152.

34.    Not only was the overall average loan size greater during the first ten days (see charts above: $239,152 vs. $206,000), but the number of approved loans for applications under $350,000 was significantly greater in the last three days before PPP funds ran out when compared to the first ten days: 881,648 approved loans in the first ten days versus 1,453,954 approved loans as of the last day PPP funds were available.  In the period between April 14 through April 16, 572,306 loans were approved, representing a 65% increase.

| Loan Size | Approved Loans | Approved Dollars | % of Count | % of Amount |
|---|---|---|---|---|
| $150K and Under | 1,229,893 | $58,321,791,761 | 74.03% | 17.04% |
| >$150K - $350K | 224,061 | $50,926,354,675 | 13.49% | 14.88% |
| >$350K - $1M | 140,197 | $80,628,410,796 | 8.44% | 23.56% |
| >$1M - $2M | 41,238 | $57,187,983,464 | 2.48% | 16.71% |
| >$2M - $5M | 21,566 | $64,315,474,825 | 1.30% | 18.79% |
| >$5M | 4,412 | $30,897,983,582 | 0.27% | 9.03% |

- Overall average loan size is $206K.

35.    That 65% increase is even more telling when compared with the difference in approved loans for applications above $2,000,000 for the same period. In the first ten days, 19,789 loans were approved versus 25,978 loans approved as of the last day PPP funds were available, meaning that 6,189 loans were approved between April 14 through April 16, equaling a 31% increase.

36.    With such varying data, it is clear that lenders such as Defendants did not process loans on a "*first-come, first-served*" basis as required by the SBA, but that the loan amount influenced when it was processed and approved.

37.    Plaintiff learned of the CARES Act and PPP when it was passed and was signed into law by President Trump.

38.    On March 27, 2020, Plaintiff received two separate marketing emails from Defendants notifying it that PNC would be offering PPP loans and urging Plaintiff to submit an application.

39.    On April 3, 2020, Plaintiff submitted an application for loan assistance through the PPP with Defendants.  Plaintiff applied for a loan through the PPP in order to keep employees on the payroll, as well as to pay rent and other utilities.  Plaintiff chose to submit a loan application with Defendants because it conducts business banking with them.

40.    The following day, April 4, 2020, Plaintiff received an email communication from Defendants acknowledging receipt of and thanking Plaintiff for its loan application.

41.    Nearly two weeks later, on April 16, 2020, Defendants notified Plaintiff that "PNC has completed its review of your application and it is being submitted to the Small Business Administration (SBA)."



42.    However, based on the "first-come, first-served" rule, Lincoln Network's application should have been promptly submitted to the SBA. Instead, PNC apparently delayed submitting the application. On April 17, 2020, PNC informed Lincoln Network via email that its application had not been timely submitted to the SBA. Instead, a bank representative told Lincoln Network that

PNC was "getting all the apps [applications] that didn't make it in ready so as soon as [sic] government puts more money in we can submit." On April 18, 2020, PNC claimed without explanation that it was "unable to complete the review and SBA registration process" for Lincoln Network's PPP loan application "before the SBA announced on its website that it is unable to accept new applications for the PPP program because the authorized funding has been fully allocated."

43.    There has been no further communication from Defendants about the status of Plaintiff's loan application.

44.    Because Plaintiff submitted an application for a loan through the PPP with Defendants, it was denied access to funds that would have helped it during this economic crisis and was prevented from seeking assistance from a different lender.

45.    Defendants claim they "discourage[] misconduct" and "maintain[] a corporate culture that emphasizes complying with" laws and regulations.

46.    However, Defendants misled and deceived their clients, including Plaintiff, into believing applications for loans through the PPP were processed in the order received with no regard to loan amount, when in fact the loan amount certainly influenced the order in which loans were processed and approved.

47.    If Defendants had not misled and deceived their small business clients, such clients could have submitted their applications for loans through the PPP with other lenders that were following the required "first-come, first-served" application processing order.  Because small businesses were only allowed to submit one application for PPP loans, they could not go to another lender for assistance.

48.    Defendants knew their clients trusted them and believed they would administer the PPP as required but chose to exploit their clients' trust.  As a result of Defendants' greed and focus on their own financial incentives, countless small businesses were prevented from benefitting from the program designed to help

them survive during the current Coronavirus crisis. Moreover, the delay and uncertainty caused by preferring bigger loan applications or "concierge" customers has wreaked devastating harm on Plaintiffs. Put simply, every day that passes without relief for these small businesses and other qualified applicants—and the hundreds of thousands of hardworking Americans they employ—pushes them closer or into financial ruin.

## V.    CLASS ACTION ALLEGATIONS

49.    Plaintiff brings this action individually and on behalf of the following class (the "Class") pursuant to Rule 23:

> All eligible persons or entities in the State of California who applied for a loan under the PPP with Defendants and whose applications were not processed by Defendants in accordance with SBA regulations and requirements or California law.

50.    Excluded from the proposed Class are Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

51.    This action is brought and may be properly maintained as a class action.  There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

52.    The members in the proposed class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the Class members in a single action will provide substantial benefits to the parties and Court.

53.    Questions of law and fact common to Plaintiff and the Class include, but are not limited to, the following:

- Whether Defendants violated the regulations for administering, processing, and handling loans through the PPP;

- Whether Defendants made false, misleading, and deceptive misrepresentations and omissions regarding their administration, processing, and handling of the applications for loans from small businesses through the PPP;

- Whether Defendants failed to administer, process, and handle loans on a "first-come, first-served" basis as required by the PPP;

- Whether Defendants administered, processed, and handled larger loans before smaller loans;

- Whether Defendants violated various California laws;

- Whether Defendants engaged in false advertising;

- Whether Defendants fraudulently concealed material facts from their clients;

- Whether Defendants' conduct was negligent per se;

- Whether Defendants breached a fiduciary duty;

- Whether Plaintiff and members of the Class are entitled to statutory and punitive damages; and

- Whether Plaintiff and the members of the Class are entitled to declaratory and injunctive relief.

54. Defendants engaged in a course of common conduct that gave rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Class. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

55.    Plaintiff's claims are typical of those of the members of the Class because they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

56.    Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

57.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Class is small such that, absent representative litigation, it would be infeasible for members of the Class to redress the wrongs done to them.

58.    Questions of law and fact common to the Class predominate over any questions affecting only individual members of a Class.

59.    As a result of the foregoing, class treatment is appropriate.

### FIRST CAUSE OF ACTION

**Violation of California Business & Professions Code § 17200, et seq.**

60.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

61.    The Unfair Competition Law ("UCL") prohibits any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

**Fraudulent**

62.    Defendants' misrepresentations and related omissions that they were working tirelessly to administer, process, and handle loan applications through the PPP in order to provide assistance to as many clients as possible and that they were

otherwise following the requirements of the PPP are literally false, misleading, and likely to deceive the public.

**Unlawful**

63.    As alleged herein, Defendants have advertised and represented their administration of loans through the PPP, such that Defendants' actions as alleged herein violate at least the following law:  The False Advertising Law, California Business & Professions Code § 17500, *et seq.* (the "FAL").

**Unfair**

64.    Defendants' conduct with respect to the administration, processing, and handling of the applications from small businesses for loans through the PPP was unfair because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to their clients.  The utility of their conduct, if any, does not outweigh the gravity of harm to their victims.

65.    Defendants' conduct with respect to the administration, processing, and handling of the applications from small businesses for loans through the PPP was also unfair because in order to maximize their financial gain associated with loans through the PPP, they prioritized larger loans over smaller ones while deceiving and misleading small business owners into believing their loans were processed on a "first-come, first-served" basis, as required by the PPP.

66.    In accordance with California Business & Professions Code § 17203, Plaintiff seeks an order enjoining Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and to discharge the funds they received from the PPP to Plaintiff and the Class members.

## SECOND CAUSE OF ACTION
### Violation of California's False Advertising Law,
### California Business & Professions Code § 17500, et seq.

67.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

68.    California's False Advertising Law ("FAL") prohibits the performance of services, professional or otherwise "which [are] untrue or misleading." Cal. Bus. & Prof. Code § 17500.

69.    As set forth herein, Defendants' misrepresentations and omissions regarding compliance with applicable laws and regulations, including SBA rules and requirements, were literally false, misleading, and likely to deceive the public.

70.    Defendants knew or reasonably should have known that all these claims were untrue or misleading.

71.    Plaintiff and the Class members are entitled to statutory, injunctive, and equitable relief in the amount of money in their respective PPP loan application.

## THIRD CAUSE OF ACTION
### Breach of Fiduciary Duty

72.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

73.    The Defendants owed and owe Plaintiff and the Class members fiduciary obligations.  By reason of their fiduciary relationships, the Defendants owed and owe Plaintiff and the Class members the highest obligation of good faith, fair dealing, loyalty, and due care.

74.    The Defendants violated and breached their fiduciary duties to Plaintiff and the Class members.

75.     Defendants made false, misleading, and deceptive misrepresentations and omissions regarding their administration, processing, and handling of the applications for loans from small businesses through the PPP.

76.     Because Defendants misrepresented their compliance with SBA regulations and requirements and California law, and omitted to disclose the material information as to their practice or policies of favoring their customers and/or larger loans, the Defendants did not engage in arms-length transactions with Plaintiff and other Class members.

77.     Additionally, Defendants unjustly profited from the administration, processing, and handling of loans through the PPP as they received origination fees based on the loan amounts.

78.     Consequently, as alleged herein, Defendants prioritized larger loans- and thus larger fees—over smaller loans to the detriment of Plaintiff and the Class.

79.     As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, Plaintiff and the Class members have sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, Defendants are liable to Plaintiff and the Class members.

80.     Plaintiff and the Class members seek declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the law.

## FOURTH CAUSE OF ACTION

### Negligence

81.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

82.     Defendants' conduct is negligent per se.

83.     As set forth above and below, Defendants violated their statutory duties under numerous statutes, including the FAL and UCL.

84.    Additionally, Defendants must comply with SBA regulations such as 13 CFR Part 120.140, which states, among other things, that lenders "must act ethically and exhibit good character" that prohibits "engag[ing] in conduct reflecting a lack of business integrity or honesty." 13 CFR Part 120.140(f); *see also* 13 CFR Part 120.140(b), (j)(1), (l).

85.    Defendants' violations of such statutes is negligence per se and was a substantial factor in the harm suffered by Plaintiff and the Class members, including their submission of applications for loans through the PPP with Defendants who violated the "first-come, first-served" basis for processing loan applications, as dictated by the PPP, when they processed larger loans ahead of smaller loans.

86.    As set forth above, such laws were intended to ensure that a company's claims about its services are truthful and accurate and that they engaged in business in an ethically and honest manner.

87.    By virtue of Defendants' negligence, Plaintiff and the Class members have been damaged in an amount to be proven at trial or alternatively, seek rescission and disgorgement under this Count.

## VI.    **DEMAND FOR JURY TRIAL**

88.    Plaintiff demands a trial by jury on all issues so triable.

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following for relief:

1.    Certifying the proposed Class; appointing Plaintiff as Class representative, and its undersigned counsel as Class counsel;

2.    An order requiring Defendants to bear the costs of class notice;

1      3.    An order enjoining Defendants from administering, processing, or

2  handling loans through the PPP in violation of SBA regulations and requirements

3  or California law;

4      4.    An order awarding declaratory relief, and any further retrospective or

5  prospective injunctive relief permitted by law or equity, including enjoining

6  Defendants from continuing the unlawful practices as alleged herein, and

7  injunctive relief to remedy Defendants' past conduct;

8      5.    An order requiring Defendants to disgorge or return all monies,

9  revenues, and profits obtained by means of any wrongful or unlawful act or

10  practice;

11      6.    An order requiring Defendants to pay punitive damages on any count

12  so allowable;

13      7.    An order requiring Defendants to pay all statutory damages permitted

14  under the counts alleged herein;

15      8.    An order awarding attorneys' fees and costs, including the costs of

16  pre-suit investigation, to Plaintiff and the Class members; and

17      9.    An order providing for all other such equitable relief as may be just

18  and proper.

19  Date:  April 23, 2020          Respectfully submitted,

20                          BERGER MONTAGUE PC

21

22                          */s/ Benjamin Galdston*

23                          BENJAMIN GALDSTON

24                          12544 High Bluff Drive, Suite 340
San Diego, CA 92130

25                          Tel:  (619) 489-0300
Email:  bgaldston@bm.net

26

27

28

BRYSON LAW PLLC
Daniel K. Bryson
(*pro hac vice* forthcoming)
PO Box 12638
Raleigh, NC 27605
Tel:  (919) 600-5000
Fax:  (919) 600-5035
Email: dan@whitfieldbryson.com


LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Robert K. Shelquist
(*pro hac vice* forthcoming)
Rebecca A. Peterson (SBN 241858)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel.: (612) 339-6900
Fax: (612) 339-0981
Email: rkshelquist@locklaw.com
          rapeterson@locklaw.com


GREG COLEMAN LAW PC
Alex R. Straus (SBN 321366)
16748 McCormick Street
Los Angeles, CA 91436
Tel.: (310) 450-9689
Email:  alex@gregcolemanlaw.com
          -and-
Gregory F. Coleman
(*pro hac vice* forthcoming)
First Tennessee Plaza
800 South Gay Street, Suite 100
Knoxville, TN 37929
Tel.: (865) 247-0080
Email: greg@gregcolemanlaw.com

*Attorneys for Plaintiff*
*and the Proposed Class*